FILED & ENTERED

MAR 09 2015

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY RUST        DEPUTY CLERK

## NOT FOR PUBLICATION

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA

### NORTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case. No. 9:10-bk-14135-PC |
| | ) | |
| REGINALD ESCOBAR SILVA and | ) | Adversary No. 9:15-ap-01014-PC |
| CARLITA MARIE SILVA, | ) | |
| | ) | Chapter 13 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | **MEMORANDUM REGARDING** |
| | ) | **PLAINTIFF'S MOTION FOR** |
| CARLITA MARIE SILVA, | ) | **PRELIMINARY INJUNCTION** |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Date:   March 5, 2015 |
| THE BOLLAG FAMILY TRUST, et al., | ) | Time:   10:00 a.m. |
| | ) | Place:  United States Bankruptcy Court |
| | ) |            Courtroom # 201 |
| Defendants. | ) |            1415 State Street |
| _____ | ) |            Santa Barbara, CA  93101 |

At the above captioned date and time, the court considered the Motion for Preliminary

Injunction ("Motion") [Dkt. # 7] filed by Plaintiff, Carlita Marie Silva ("Silva") seeking to enjoin

Defendants, Michael Bollag, The Bollag Family Trust (collectively, the "Bollags") and MBB

Properties, Inc. ("MBB") from transferring any interest in the real property located at 1100 North

3rd Street, Lompoc, CA (the "Subject Property") pending resolution of this adversary

proceeding.  Having considered Silva's Motion, the response of the Bollags and MBB in opposition thereto, the reply, and argument of counsel, the court will deny Silva's Motion based on the following findings of fact and conclusions of law made pursuant to F.R.Civ.P. 52(a),[1] as incorporated into FRBP 7052 and applied to contested matters by FRBP 9014(c).

<u>STATEMENT OF FACTS</u>

On January 1, 2008, Silva and her husband, Reginald E. Silva, owned the Subject Property.  They had owned and occupied the Subject Property since 1988.  The Subject Property was encumbered by two deeds of trust:  (1) a first deed of trust lien recorded on May 19, 2004, securing payment of a note in the original principal sum of $125,000, executed by Carlita M. Silva and Reginald Silva and payable to World Savings Bank, FSB dated May 13, 2004; and (2) a second deed of trust lien recorded on April 27, 2005, securing payment of a note in the original principal sum of $30,000 executed by Carlita M. Silva and Reginald Silva and payable to World Savings Bank, FSB dated April 22, 2005.

On September 3, 2008, a Notice of Default and Election to Sell Under Deed of Trust was recorded as to the <u>second</u> deed of trust.  A Notice of Trustee's Sale was thereafter recorded on January 29, 2009.  On August 12, 2009, a Trustee's Deed Upon Sale ("Trustee's Deed") was executed following a foreclosure sale conducted on August 10, 2009, at which the Subject Property was purchased by the Bollags for the sale price of $34,127.49.  The Trustee's Deed conveyed title to the Subject Property to The Bollag Family Trust and Michael Bollag, <u>subject to</u> the first deed of trust lien securing payment of the $125,000 note.  Silva claims that, at the time, she was not aware of the foreclosure sale nor execution of the Trustee's Deed.

---

[1]  Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 after its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005).  "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("F.R.Civ.P.").  "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

On September 1, 2009, Todd Lyle ("Lyle"), an employee of MBB,[2] met with Silva "and informed her that the [Subject Property] had been sold pursuant to a properly noticed foreclosure sale held on August 10, 2009, and that The Bollag Family Trust and Michael Bollag were the new owners of the [Subject Property]."[3]  Silva testified that:

> I do recall a man coming to my house at about the time Todd Lyle says he did, September 1, 2009.  This man told me I did not "own the property."  I did not believe him.  I was in the process of trying to negotiate a loan modification with the first mortgage, which was the same entity that held the second mortgage at the time.  The person I was working with on the loan modification told me not to worry about what this man said.  I believed her when she told me he did not own my house.[4]

On July 21, 2010, Wells Fargo Bank, N.A. ("Wells Fargo"), as successor in interest to World Savings Bank, FSB, caused a Notice of Trustee's Sale to be recorded as to the first deed of trust.  On August 10, 2010, Silva and her husband filed a voluntary petition under chapter 13, in part, to stop the foreclosure by Wells Fargo.  In their schedules, the Silvas disclosed in Schedule A that they owned the Subject Property valued at $195,000 in "Fee Simple."  Neither the Bollags or MBB are listed in the list of creditors, mailing matrix, schedules or statements nor is the foreclosure sale conducted pursuant to the second deed of trust lien disclosed in response to Question # 5 of the Statement of Financial Affairs.

On November 10, 2010, an order was entered confirming the Silva's Chapter 13 Plan ("Plan").  The Plan provided for post-petition mortgage payments to be made directly to Wells Fargo on the $125,000 note, with arrears to be cured over a period of 60 months.  Reginald E. Silva died in 2012.  Silva is current on Plan payments, with about 7 payments remaining until completion of the Plan.

---

[2] MBB is owned and operated by Michael Bollag and the Bollag Family Trust.  Memorandum of Points and Authorities in Opposition to Motion for Preliminary Injunction ("Opposition"), 13:8-9.

[3] Id. at 13:17-20.

[4] Motion, 16:14-20.

On October 16, 2014, the Trustee's Deed was recorded in the Santa Barbara County Recorder's Office – over 5 years after the Trustee's Deed was executed and delivered to the Bollags. According to Lyle's testimony:

> Michael Bollag and The Bollag Family Trust did not immediately record their Trustee's Deed Upon Sale because they inadvertently believed that they had purchased the [Subject Property] at a foreclosure sale conducted by the first trust deed holder, not the second. When they discovered their error, they attempted to contact the owners of the first trust deed to ascertain the loan payoff amount. However, the first trust deed holder would not discuss this with Michael Bollag, The Bollag Family Trust, and MBB Properties, LLC ("the "Bollag Entities"). The Bollag Entities were disinclined to become the record owners of the [Subject Property] because there was likely little, or no, equity in the [Subject Property] above what was owed to the first trust deed holder, and they did not want to risk have [sic] their credit sullied by getting foreclosed out by the first trust deed holder. Instead, Michael Bollag and The Bollag Family Trust decided not to become record owners, to allow Ms. Silva to live on the [Subject Property] without paying rent to them, and to see if the [Subject Property] increased in value over time to make it worthwhile for them to become record owners.[5]

On October 17, 2014, the Bollags executed a Quitclaim Deed, conveying the Subject Property to MBB. The Quitclaim Deed was recorded the same day. When the Trustee's Deed and Quitclaim Deed were recorded, there was no notice of Silva's bankruptcy in the chain of title; and, according to Lyle's testimony, the Bollags and MBB did not have any knowledge of Silva's bankruptcy.[6] On October 24, 2014, the Bollags and MBB served Silva with a Notice of New Ownership. Silva, through counsel, informed the Bollags and MBB that Silva had filed a chapter 13 petition on August 10, 2010. Lyle testified that "[t]his was the Bollag Entities' first and sole notification that Silva had filed Chapter 13 bankruptcy."[7]

The Bollags and MBB never took possession of the Subject Property. Silva remained in possession of the Subject Property continuously between the foreclosure sale on August 10, 2009 and the recordation of the Trustee's Deed on October 16, 2014. During this period, Silva made

---

[5] Opposition, at 13:21-14:5.

[6] Id. at 14:12-23.

[7] Id. at 14:27-28.

all payments to Wells Fargo on the $125,000 note secured by the Subject Property, and paid the insurance and property taxes due on the Subject Property (with one crucial exception).

On December 15, 2014, MBB filed a motion seeking relief from the automatic stay under §§ 362(d)(1) and (d)(2) ("Stay Motion") to exercise its rights with respect to the Subject Property, including an annulment of the stay to validate the post-petition recordation of the Trustee's Deed and Quitclaim Deed. Silva filed a response in opposition to the Stay Motion. A hearing on the Stay Motion was commenced on February 3, 2015, and continued to March 10, 2015.

In the meantime, Silva filed a complaint in this adversary proceeding against the Bollags and MBB on January 27, 2015, for alleged violation of the automatic stay, avoidance of transfer under §§ 544 and 549, adverse possession, quiet title, fraud, and declaratory relief. On February 9, 2015, Silva filed an amended complaint, together with the Motion seeking a preliminary injunction to prevent the Bollags and MBB from transferring any interest in the Subject Property pending a final judgment in this adversary proceeding. The Bollags and MBB filed written opposition to the Motion on February 19, 2015, to which Silva replied on February 23, 2015. After a hearing on March 5, 2015, the matter was taken under submission.

## II. DISCUSSION

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), (K) and (O). Venue is appropriate in this court. 28 U.S.C. § 1409(a). To the extent that the claims made the basis of Silva's complaint constitute "Stern claims,"[8] Silva, the Bollags and MBB expressly consent to the entry of a final judgment by the bankruptcy court.

---

[8] "These claims are called 'Stern claims,' so named after the Supreme Court's decision in Stern v. Marshall, ___ U.S., ___, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). Stern claims are claims 'designated for final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a constitutional matter.'" Mastro v. Rigby, 764 F.3d 1090, 1093 (9th Cir. 2014) (citation omitted).

A. Standard for Issuance of a Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  To obtain a preliminary injunction, the moving party must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter, 555 U.S. at 20.  The Ninth Circuit's "sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in Winter."  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134 (9th Cir. 2011).  It must, however, be "applied as part of the four-element Winter test.  That is, 'serious questions going to the merits' and a balance of hardships that tips sharply toward the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  Id. at 1135.

B. Likelihood of Success on the Merits

    1. First & Third Claims for Relief – Violation of the Automatic Stay & § 549(c)

    In her amended complaint, Silva claims that the Bollags and MBB violated § 362(a)(3) by recording the Trustee's Deed and Quitclaim Deed after the petition date, and that her claim to the Subject Property is superior to that of the Bollags and MBB, notwithstanding § 549(c), because MBB in conjunction with the Quitclaim Deed neither paid "present fair equivalent value" nor is it a "good faith purchaser."[9]

    Section 362(b)(3) states, in pertinent part, that the filing of a bankruptcy petition does not operate as a stay "of any act to perfect . . . an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b)."  11 U.S.C. § 362(b)(3).  "Section 546(b) provides that a trustee's right to avoid a transfer pursuant to 11 U.S.C. §§ 544(a) or 549 is subject to any generally applicable law that permits perfection to relate back and to be effective against one who acquires rights in the property before the date of perfection."  In re Stork, 212 B.R. 970, 971 (Bankr. N.D. Cal. 1997).  "[R]ecordation of a foreclosure sale deed

---

[9]  Amended Complaint, 3:21-22; 4:24-26.

within fifteen days of the sale does not violate the automatic stay and is not avoidable pursuant to

11 U.S.C. §§ 544 or 549." Id.; see Cal. Civ. Code § 2924h(c). "[I]f a foreclosure sale purchaser

does not qualify for protection under section 2924h(c) of the California Civil Code, it may still

be protected by 11 U.S.C. § 549(c)" which "protects a purchaser regardless of the number of

days after the sale the purchaser records the deed as long as the deed is recorded before notice of

the bankruptcy filing is recorded." Stork, 212 B.R. at 972 (emphasis in original).

Section 549(a) authorizes a trustee to avoid an unauthorized transfer of estate property

that occurs after the commencement of the case. 11 U.S.C. § 549(a). Section 549(c) states, in

pertinent part:

> The trustee may not avoid under [§ 549(a)] a transfer of an interest in real
> property to a good faith purchaser without knowledge of the commencement of
> the case and for present fair equivalent value unless a copy or notice of the
> petition was filed, where a transfer of an interest in such real property may be
> recorded to perfect such transfer, before such transfer is so perfected that a bona
> fide purchaser of such real property, against whom applicable law permits such
> transfer to be perfected, could not acquire an interest that is superior to such
> interest of such good faith purchaser.

11 U.S.C. § 549(c).

In this case, the Bollags purchased the Subject Property at a duly conducted foreclosure

sale on August 10, 2009, and received the Trustee's Deed. Following receipt of the Trustee's

Deed, the Bollags owned equitable title to the Subject Property and Silva owned legal title to the

Subject Property. See Davisson v. Engles (In re Engles), 193 B.R. 23, 25 (Bankr. S.D. Cal.

1996) ("Until the deed from a prepetition foreclosure sale is recorded, a debtor retains legal title

to the property."). On her petition date, Silva's legal title and possessory interest in the Subject

Property became property of the estate and subject to the automatic stay. See, e.g., Hunt v. TRC

Properties, Inc. (In re Hunt), 160 B.R. 131, 135 (9th Cir. BAP 1993) ("The legal title Hunt held

in the Oxnard Property at the time her petition was filed became property of her estate."); Engles,

193 B.R. at 25 ("If the debtor files bankruptcy immediately following the sale, the legal title

accompanies the debtor into bankruptcy and becomes property of the estate.").

On October 16, 2014, the Bollags recorded the Trustee's Deed --- more than five years

after the foreclosure sale. Because recordation fell outside of the protection of Cal. Civ. Code §

2924h(c), the issue is whether or not the Bollags' post-petition recording of the Trustee's Deed was excepted from the automatic stay under § 362(b)(3) by virtue of §§ 546(c) and 549(c). The court believes that it was so excepted.

First, Silva, acting in place of a trustee, is seeking to avoid the recording of the Trustee's Deed as an alleged unauthorized post-petition transfer of an interest in real property that is property of the estate. The Bollags, against whom Silva is proceeding to avoid the transfer, are good faith purchasers. The Bollags purchased the Subject Property at a regularly conducted foreclosure sale on August 10, 2009. At the time, Silva was not in bankruptcy and there was no automatic stay in effect. It appears the Bollags paid "present fair equivalent value" for the Subject Property at the foreclosure sale. The Bollags purchased the Subject Property with a winning bid of $34,127.49, subject to the first deed of trust which secured the balance due on the $125,000 note. The court takes judicial notice of Wells Fargo's Proof of Claim # 11-2 which states that the balance owing on the $125,000 note on the petition date -- one year after the foreclosure sale -- was $162,141.75. Silva valued the Subject Property in Schedule A at $195,500. Finally, the Bollags did not have actual or constructive notice of the commencement of Silva's bankruptcy case on August 10, 2010, nor did the Bollags have actual or constructive notice of Silva's bankruptcy when the Trustee's Deed was recorded. Lyle testified that the Bollags and MBB did not learn of Silva's bankruptcy until on or after October 24, 2014. There is no evidence to the contrary. Once the Trustee's Deed was validly recorded, the Bollags held both legal and equitable title to the Subject Property -- which gave them the right to execute the Quitclaim Deed to MBB without violating the automatic stay. Based on the foregoing, the court finds that Silva has neither established a likelihood of success on the merits of her First and Third Claims for Relief nor raised a serious question regarding the merits of the claims of the Bollags and MBB.

    2.  <u>Second Claim for Relief – Avoidance under § 544(a)(3)</u>

In her amended complaint, Silva claims that she is "entitled to title" to the Subject Property under § 544(a)(3) "[a]s a result of filing the bankruptcy petition prior to the recording

documents being recorded."[10] "[C]hapter 13 debtors may exercise trustee avoiding powers concurrently with the trustee." <u>Houston v. Eiler (In re Cohen)</u>, 305 B.R. 886, 899 (9th Cir. BAP 2004). Section 544(a)(3) gives a bankruptcy trustee "the power to avoid any transfer that a hypothetical bona fide purchaser for value could have avoided under the law of the state in which the real property is located." <u>Chase Manhattan Bank, USA, N.A. v. Taxel (In re Deuel)</u>, 594 F.3d 1073, 1076 (9th Cir. 2010).

Section 546(a)(1)(A) states, in pertinent part, that "[a]n action or proceeding under section 544 . . . of the Bankruptcy Code may not be commenced "2 years after the entry of the order for relief." 11 U.S.C. § 546(a)(1)(A). The order for relief was entered on August 10, 2010. The applicable limitations period under § 546(a)(1) expired on August 10, 2012. Silva did not file her complaint in this the adversary proceeding until January 27, 2015. Because it is untimely, the claim is likely barred by limitations absent equitable tolling.

Under federal law, the doctrine of equitable tolling is "read into every federal statute of limitations." <u>Holmberg v. Armbrecht</u>, 327 U.S. 392, 397 (1946); <u>Ernst & Young v. Matsumoto (In re United Ins. Mgmt, Inc.)</u>, 14 F.3d 1380, 1385 (9th Cir. 1994). However, "equitable tolling is rarely applied and disfavored." <u>Akers v. Mattei (In re Dugger)</u>, 2012 WL 2086562, *7 (9th Cir. BAP 2012). "[E]quitable tolling principles are . . . applied 'only sparingly'" because "'Congress must be presumed to draft limitations periods in light of' equitable tolling principles which generally apply to statutes of limitations." <u>Ca. Franchise Tax Bd. v. Kendall (In re Jones)</u>, 657 F.3d 921, 926 (9th Cir. 2011) (quoting <u>Young v. United States</u>, 535 U.S. 43, 49-50 (2012). Furthermore, "[t]he need for finality is an important bankruptcy policy." <u>Dery v. Rosenberg</u>, 2003 WL 21919267, *10 (E.D. Mich. 2003).

Equitable tolling is applied under federal law in two types of situations: (1) where defendant's wrongful conduct prevented plaintiff from timely asserting his claim, and (2) where extraordinary circumstances outside plaintiff's control make it impossible for plaintiff to timely

---

[10] <u>Id.</u> at 4:17-18.

assert his claim.  <u>Seattle Audubon Soc. v. Robertson</u>, 931 F.2d 590, 595 (9th Cir. 1991), <u>rev'd on</u>

<u>other grounds</u>, 503 U.S. 429 (1992); <u>Amazing Enters. v. Jobin (In re M&L Bus. Mach., Inc.)</u>,

153 B.R. 308, 311 (D. Colo. 1993).  Equitable tolling is permitted when it would effectuate: (1)

the policies underlying the statute, and (2) the purposes of the limitations period.  <u>Gurney v.</u>

<u>Arizona Dept. of Revenue (In re Gurney)</u>, 192 B.R. 529, 538 (9th Cir. BAP 1996).

      Equitable tolling has been applied to extend the limitations period under § 546(a)(1).  <u>See</u>

<u>Ernst & Young v. Matsumoto (In re United Ins. Mgmt., Inc.)</u>, 14 F.3d 1380, 1384 (9th Cir. 1994)

(stating that "equitable tolling may, in proper cases, apply to § 546(a)(1) . . . .").  "Generally, a

litigant seeking equitable tolling bears the burden of establishing two elements:  (1) that he has

been pursuing his rights diligently; and (2) that some extraordinary circumstances stood in his

way."  <u>Roberts v. Marshall</u>, 627 F.3d 768, 771 (9th Cir. 2010) (quoting <u>Pace v. DiGuglielmo</u>,

544 U.S. 408, 418 (2005).

      In this case, it does not appear that equitable tolling will help Silva because Silva admits

in conjunction with her adverse possession claim that she became aware that the Bollags claimed

ownership of the Subject Property as early as September 1, 2009.  Therefore, Silva had actual or

inquiry notice of the Bollags' claim to the Subject Property and, in the exercise of due diligence,

could have timely filed an avoidance action under § 544(a)(3) prior to August 10, 2012.  Based

on the foregoing, the court finds that Silva has failed to establish that she is likely to succeed on

the merits of her Second Claim for Relief or to raise serious questions regarding the merits of the

claims asserted by the Bollags and MBB.

      3.  <u>Fourth Claim for Relief – Adverse Possession</u>

      In her amended complaint, Silva asserts that she became the true owner of the Subject

Property on August 10, 2014, by adverse possession pursuant to Cal. Civ. Code § 324 having

continuously occupied the Subject Property and paid property taxes thereon since August 10,

2009.[11]

---

[11] <u>Id.</u> at 5:8-6:9.

"Where it appears that there has been an actual continued occupation of land, under a claim of title, exclusive of any other right, but not founded upon a written instrument, judgment or decree, the land so actually occupied, and no other, is deemed to have been held adversely." Cal. Code Civ. P. § 324.  "To establish adverse possession, the claimant must prove: (1) possession under claim of right or color of title; (2) actual, open, and notorious occupation of the premises constituting reasonable notice to the true owner; (3) possession which is adverse and hostile to the true owner; (4) continuous possession for at least five years; and (5) payment of all taxes assessed against the property during the five-year period." Mehdizadeh v. Mincer, 46 Cal. App. 4th 1296, 1305 (1996); see Cal. Code Civ.P. § 325.  "The burden is on the claimant to prove every essential element by clear and satisfactory evidence." Weller v. Chavarria, 233 Cal. App.2d 234, 242 (1965).

In her Motion, Silva asserts that the requisite five-year period of adverse possession commenced on September 1, 2009, not August 10, 2009, as alleged in the amended complaint, and that it expired on September 1, 2014 ("Adverse Possession Period").  Silva has demonstrated a substantial likelihood of establishing all of the elements of adverse possession for the five-year period of September 1, 2009 through September 1, 2014, except the tax requirement.

Section 325(b) of the California Code of Civil Procedure states:

"In no case shall adverse possession be considered established under the provision of any section of this code, unless it shall be shown that the land has been occupied and claimed for the period of five years continuously, and the party or persons, their predecessors and grantors, have timely paid all state, county, or municipal taxes that have been levied and assessed upon the land for the period of five years during which the land has been occupied and claimed.  Payment of those taxes by the party or persons, their predecessors and grantors shall be established by certified records of the county tax collector."

Cal. Civ. Proc. Code § 325(b) (emphasis added).  In this case, Silva had the burden of showing that she paid all taxes "levied and assessed" on the Subject Property during the period of possession -- September 1, 2009 to September 1, 2014.

As pointed out in the Opposition, "[t]he county assessor must assess all property subject to general property taxation at its full value on January 1 of each year." Cmty. Dev. Comm'n of

City of Oxnard v. Cnty. of Ventura, 152 Cal.App.4th 1470, 1476 (2007). "The word 'assessment' in [§ 325] refers to the act of the assessor" and "[t]he word 'levied' refers to the act of the board of supervisors or city council." Smith v. Byer, 179 Cal.App.2d 118, 121 (1960). "A lien for the yearly assessment attaches to the property 'annually as of 12:01 a.m. on the first day of January preceding the fiscal year for which the taxes are levied.'" Cmty. Dev. Comm'n of City of Oxnard, 152 Cal.App.4th at 1476 (quoting Cal. Rev. & Tax Code § 2192).

With respect to adverse possession, "all taxes levied and assessed during the period of possession must be paid even though more than five years is required." Smith, 179 Cal.App.2d at 120. "If occupancy and claim start at a time of year when payment of all taxes cannot be made in five years, then more than five years must elapse before title by adverse possession can be established." Id. at 120-121.

Based on a levy and assessment date of January 1 each year, the levied and assessed property taxes during the Adverse Possession Period in this case covered the years 2010, 2011, 2012, 2013, and 2014. Silva paid all of these taxes, except the taxes for 2014. The first installment of the 2014 tax came due on November 1, 2014 and was paid by MBB on October 17, 2014. The second installment of the 2014 tax came due on February 1, 2015, but was paid by MBB on October 20, 2014.[12]

Silva asserts that the applicable five-year period for the payment of taxes included 2009 and excluded 2014. However, the 2009 tax was assessed and levied on January 1, 2009, before commencement of the Adverse Possession Period on September 1, 2009. The 2009 tax was not assessed and levied during the Adverse Possession Period. The 2014 tax was, in fact, assessed and levied during the Adverse Possession Period. Silva's adverse possession claim hinged on payment of the 2014 tax installments. The fact that Cal. Code Civ.P. § 325(b) was amended in 2010 to add the word "timely" does not change this result.

Because Silva has neither alleged nor demonstrated timely payment of the 2014 taxes on the Subject Property, the court finds that Silva has neither established a likelihood of prevailing

---

[12] A search on the County of Santa Barbara Treasurer and Tax Collector's web site confirmed MBB's payment of the 2014 taxes on the Subject Property.

on the merits of her adverse possession claim nor raised serious questions regarding the merits of

the claims of the Bollags and MBB.

B.  Likelihood of Irreparable Injury

Silva argues that she will suffer irreparable harm in the absence of injunctive relief

because there is no remedy for loss of real property.  The Subject Property is Silva's primary

residence, and "loss of a primary residence constitutes irreparable harm."  Hernandez v. Downey

Sav. & Loan Ass'n, 2009 WL 704381, *9 (S.D. Cal. 2009).  See Nichols v. Deutsche Bank Nat'l

Trust Co., 2007 WL 4181111, *3 (S.D. Cal. 2009) ("[I]mminent foreclosure of Plaintiff's

residence presents a threat of irreparable harm.").

Silva's losing her home would be an irreparable injury, but she has demonstrated

virtually no likelihood of prevailing on the merits of her First, Second, Third and Fourth Claims

for Relief.  As previously stated, Silva owned only legal title to the Subject Property on the

petition date and the Bollags held equitable title by virtue of the foreclosure sale on August 10,

2009.  Once the Trustee's Deed was recorded, the Bollags acquired both legal and equitable title

to the Subject Property.  Silva has only a possessory interest in the Subject Property, and she has

not demonstrated that she is likely to prevail on her adverse possession claim.  Silva's Sixth

Claim for Relief seeks actual and punitive damages for alleged fraud.  Silva's remedy at law for

her Sixth Claim for Relief is adequate.

C.  Balance of Hardships and Public Interest

Silva does not address the balance of hardships in her Motion nor has she demonstrated

that she would experience more hardship than the Bollags and MBB if a preliminary injunction

were denied.  Given the record, this element tips in favor of the Bollags and MBB.  Although

there is a likelihood of irreparable harm, Silva has not established a likelihood of success on the

merits of her First, Second, Third and Fourth Claims for Relief, and the Bollags and MBB will

suffer pending a final judgment if they are enjoined from exercising their rights with respect to

the Subject Property.

Finally, Silva's Motion does not address the final prong -- whether a preliminary

injunction is in the public interest.  "[C]onsiderations of the public interest involve testing

whether the relief requested would affect the public at large, as opposed to the immediate parties to the [proceeding]."  <u>Acton v. Fullmer (In re Fullmer)</u>, 323 B.R. 287, 305 (Bankr. D. Nev. 2005).  Silva has not articulated a public interest that would be served by issuance of a preliminary injunction.

<u>CONCLUSION</u>

For the reasons stated, Silva's Motion seeking the issuance of a preliminary injunction will be denied.

A separate order will be entered consistent with this memorandum.

###

Date: March 9, 2015

Peter H. Carroll
United States Bankruptcy Judge